# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JANE DOE (K.R.D.) an individual, | |
| Plaintiff, | |
| v. | CIVIL ACTION NO: 2:24-cv-8174 |
| WYNDHAM HOTELS & RESORTS, INC. and BA Hotel, LLC, | |
| Defendants. | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Jane Doe (K.R.D.) files this Original Complaint against WYNDHAM HOTELS & RESORTS, INC. and BA HOTEL, LLC, as Defendants and respectfully shows the Court as follows:

## SUMMARY

1.    Jane Doe (K.R.D.) files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured at Hawthorn Suites; owned, operated, maintained, and controlled by Defendants and their agents and employees.

2.    Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[1] Traffickers use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

3.    Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many

---

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.

state legislatures, that combating sex trafficking requires more than just criminal penalties for traffickers and sex buyers.

4.      Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

5.      In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

6.      As discussed herein, Defendants derived financial benefit from facilitating sex trafficking by providing venues where traffickers could exploit victims, including victims like Jane Doe (K.R.D.) with minimal risk of detection or interruption. Defendants continued supporting traffickers, including Jane Doe (K.R.D.)'s traffickers, despite evident and apparent signs of widespread and ongoing sex trafficking in these hotels. Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

## **PARTIES**

7.      Plaintiff, Jane Doe (K.R.D.) is a resident of Nevada. She may be contacted through her lead counsel, whose information is contained below.

8.      Jane Doe (K.R.D.) is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of causing her, through force, fraud or coercion, to commit a commercial sex act.

2

9.      Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of Jane Doe (K.R.D.).

10.     Wyndham Hotels & Resorts, Inc. is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey. Wyndham Defendant Hotels & Resorts, Inc. may be served through its registered agent for service Corporate Creations Network Inc. at 3411 Silverside Road, Rodney Building #104, Wilmington, Delaware 19810.

11.     All references to Wyndham Hotels & Resorts, Inc. include any department, division, office, agency, subsidiary, corporate affiliate, predecessor corporation, or successor corporation, whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority or implied/apparent authority), employee, person, firm, or corporation acting on behalf of Wyndham Hotels and Resorts, Inc. now or at any time relevant to the claims herein.

12.     Wyndham Hotels & Resorts, Inc. will be referred to as "Wyndham" "Wyndham Defendant" or "Franchisor Defendant."

13.     BA Hotel, LLC is a for-profit California Limited Liability Company with its principal place of business in Fullerton, California. Defendant BA Hotel, LLC can be served through its registered agent, Kwang Nam Kang located at 817 N Harbor Blvd., Fullerton, California 92832. At all relevant times, BA Hotel, LLC owned and operated the Hawthorn Suites located at 321 Bercut Drive, Sacramento, CA 95814.  BA Hotel, LLC, will be referred to as a "Franchisee Defendant."

## JURISDICTION AND VENUE

14.      This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

15.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in this district.

16.    Wyndham's principal place of business is in Parsippany, New Jersey, within the District of New Jeresy. Therefore, Wyndham is a resident of the District of New Jersey for the purpose of § 1391(b)(1).

17.    Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the District of New Jersey.

18.    Plaintiff's claims against Franchisee arise out of Franchisee's contacts with New Jersey through Franchisee's relationship with the Wyndham Defendant, which has its principal place of business in the District of New Jersey. Franchisee's participation in a venture with the Wyndham Defendant operating the subject hotel occurred, in substantial part, in New Jersey.

19.    Upon information and belief, Defendant BA Hotel, LLC contractually consented to jurisdiction in the District of New Jersey.

## STATEMENT OF FACTS

### I.    Jane Doe (K.R.D.) is a Survivor of Unlawful Sex Trafficking at a Hotel Owned, Operated, Managed and Controlled by Defendants.

20.    Jane Doe (K.R.D.) was trafficked through force and coercion by her trafficker to engage in numerous commercial sex acts.  Jane Doe (K.R.D.)'s trafficker pretended to be her boyfriend, and he who used physical violence and their romantic relationship to coerce and force Jane Doe (K.R.D.) to engage in commercial sex.  Jane Doe (K.R.D.)'s trafficker controlled her by regularly beating her, withholding food, and preventing her from holding her infant child unless she returned to her trafficker with enough money.   In total, Jane Doe (K.R.D.) was trafficked

4

continuously from April 2014 through December 2016. Jane Doe (K.R.D.) was specifically trafficked from April 2014 through July 31 of 2014 at the following Wyndham location:

    a. BA Hotel, LLC d/b/a Hawthorn Suites, located at 321 Bercut Drive, Sacramento, CA 95814.

21.    Jane Doe (K.R.D.)'s trafficking repeatedly occurred in rooms of this Wyndham location and was facilitated by the Wyndham Defendant.

## II. The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.

22.    While the widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what Wyndham Defendant knew or should have known regarding the trafficking at their hotel properties, the specific trafficking activity that resulted in the trafficking of Jane Doe (K.R.D.) was pervasive and apparent at the location at issue.

23.    Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[2] For years, sex traffickers have "been able to reap enormous profits with little risk when attempting to operate within hotels."[3] In 2014, 92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[4] Hotels have been found to account for over 90 percent of commercial exploitation of children.[5]

---

[2] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id*

[3] *See Human Trafficking in the Hotel Industry*, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

[4] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf

[5] Erika R. George & Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery*, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

24.    Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.[6]

25.    Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[7]

26.    Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of, includelearning to identify warning signs and indicators of sex trafficking, including but not limited to:

   a.   Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

   b.   Individuals show signs of physical abuse, restraint, and/or confinement;

   c.   Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

   d.   Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

---

[6] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *Red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

[7] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023);National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).

e.   Individuals lack freedom of movement or are constantly monitored;

f.   Individuals avoid eye contact and interaction with others;

g.   Individuals have no control over or possession of money or ID;

h.   Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

i.   Individuals have few or no personal items—such as no luggage or other bags;

j.   Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

k.   A group of girls appears to be traveling with an older female or male;

l.   A group of males or females with identical tattoos in similar locations.  This may indicate "branding" by a trafficker;

m.   Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

n.   Possession of bulk sexual paraphernalia such as condoms or lubricant;

o.   Possession or use of multiple cell phones; and

p.   Possession or use of large amounts of cash or pre-paid cards.[8]

27.    The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Tool kits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[9]  From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

28.    The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that

---

[8] *Id.*
[9] Department of Homeland Security, *Blue Campaign Toolkit*, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

most individuals involved in prostitution are subject to force, fraud, or coercion.[10] It is also well understood, and specifically trained in hotel safety training courses, that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator: the exchange of sex for money.

29.    The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[11]

30.    All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

31.    The most effective weapon against sexual exploitation and human trafficking is education and training.[12]  As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[13]

---

[10] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.

[11] *Id.*

[12] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).

[13] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.

32.     This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[14]  In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

33.     Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking necessary steps to identify and prevent trafficking in its hotels is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

34.     The Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

35.     Unfortunately for Jane Doe (K.R.D.), the promises made by the Defendants have proven empty. Defendants have failed, at all levels, to take appropriate action in response to their knowledge of widespread and ongoing human trafficking in their hotels. Instead, they have continued financially benefiting by providing venues for the sexual exploitation of victims like Jane Doe (K.R.D.).

---

[14] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

### III.    Sex Trafficking Has Long Been Prevalent at Wyndham Branded Properties, and Defendants Have Known About It.

36.    Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants has known, since well before Jane Doe (K.R.D.)'s trafficking, that sex trafficking was ongoing and widespread at Wyndham branded properties including the subject property named herein.

### a.  Sex Trafficking at Wyndham Branded Hotels was well Known by Defendants

37.    Upon information and belief, each of the Defendants monitored criminal activity occurring at Wyndham branded hotels and were aware of activity indicating commercial sex, sex trafficking and/or related crimes occurring at those branded hotels, including the specific hotel property where Jane Doe (K.R.D.) was trafficked.

38.    Scores of news stories from across the US highlight Wyndham's facilitation of sex trafficking and certainly establish that Defendants knew, or should have known, of the use of Wyndham hotels for sex trafficking.

39.    Information that has become public through news stories establishes the entrenched and pervasive nature of Wyndham's role in providing a venue where sex trafficking has continued unabated for years. Among notable press involving the frequent use of Wyndham hotels for illegal activity, the following was noted:

- "Man arrested in Metairie on human trafficking charges; accused of forcing North Carolina teens into prostitution"[15]

---

[15] *Man arrested in Metairie on human trafficking charges; accused of forcing North Carolina teens into prostitution*, NOLA.com (Jul 20, 2010),
Man arrested in Metairie on human trafficking charges; accused of forcing North Carolina teens into prostitution | Crime/Police | nola.com

- "Federal officials catch, arrest man alleged to have prostituted Jupiter girl, 14"[16]

- "Hagerstown man charged with trafficking of two teenage girls"[17]

40.    Ultimately, several hundred traffickers involved with hundreds of victims have been prosecuted by state and federal law enforcement agencies for sex trafficking and forced prostitution out of Wyndham branded properties.

41.    Based on information and belief, the Wyndham Defendant managed and monitored on-line reviews of Wyndham hotel locations:

- A Booking.com review from September 29, 2021 states: "Negative: The cops pulled us over after we left the parking lot. They told us that this motel was known fir [sic] drugs and sex rings"[18]

- A Google.com review from 2018 states: "Problem I have is owner. He treats women very poorly and makes his underage children work there. A lot of prostitution that I'm sure owner aware of. I seen him talking to this guy that has checked in 3 different times with 3 different [sic]"[19]

- A Trip Advisor review from June 20, 2014 states: "I witnessed what seemed to be prostitution in and out of the hotel. A huge party went on "in the hallways" well into the night with full tilt hip hop music. The following morning I experienced a naked woman being attacked in the hallway and had to intervene when not one other hotel security, management came to help."[20]

---

[16] *Federal officials catch, arrest man alleged to have prostituted Jupiter girl, 14*, The Palm Beach Post (March 31, 2012) https://www.palmbeachpost.com/story/news/crime/2012/02/08/federal-officials-catch-arrest-man/7283405007/
[17] *Hagerstown man charged with trafficking of two teenage girls*, Herald Mail Media (July 1, 2015) Hagerstown man charged with trafficking of two teenage girls (heraldmailmedia.com)
[18] https://www.booking.com/hotel/us/days-inn-clarksville-tn.html
[19]https://www.google.com/travel/hotels/Days%20Inn%20127%20W%20Byers%20Ave,%20New%20Stanton,%20PA%2015672%20google/entity/CgoIiJGz_YeevpIDEAE/prices?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,4515404,4597339,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4886082,4886480,4893075,4902277,4905351,4926165,4926489,4931360,4936396,4937897,4940607,47061553&hl=en-US&gl=us&ssta=1&q=Days+Inn+127+W+Byers+Ave,+New+Stanton,+PA+15672+google&grf=EmMKLAgOEigSJnIkKiIKBwjnDxAEGBASBwjnDxAEGBEgADAeQMoCSgcI5w8QARgfCjMIDBIvEi2yASoSKAomCiQweDg4MzRkOTA1ZjM5OTA5YmQ6MHgzMjRmRmOGYwN2ZhY2M4ODg&rp=EIiRs_2Hnr6SAxCIkbP9h56-kgM4AkAASAHAAQI&ictx=1
[20] https://www.tripadvisor.com/Hotel_Review-g60097-d1571552-Reviews-Days_Inn_Suites_by_Wyndham_Milwaukee-Milwaukee_Wisconsin.html

42. This sampling of news stories, reviews, and other public information establishes that, at the time Jane Doe (K.R.D.) was trafficked at the subject properties, the Wyndham Defendant knew or should have known that:

    a. There was widespread and ongoing sex trafficking occurring at Wyndham branded properties;

    b. Sex trafficking was a brand-wide problem for Wyndham originating from management level decisions at their corporate offices in Carrollton, Texas;

    c. Wyndham franchisees and hotel staff were not taking reasonable steps to identify, report, and respond to known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties;

    d. Wyndham's efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective; and

    e. Wyndham and its franchisees were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

43. Despite the mounting evidence that sex trafficking at its properties was ongoing and growing, Wyndham chose to earn revenue by continuing conduct that they knew or should have known would facilitate that trafficking.

**b. Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the subject Wyndham location.**

44. Defendants were specifically aware that sex trafficking was widespread and ongoing at the subject Wyndham location.

45. Internet reviews for the subject Wyndham location, which upon information and belief the Defendants manage and monitor, show the pervasiveness of sex trafficking before and well after Jane Doe (K.R.D.) was trafficked. For example:

    • A 2012 Yelp review for the subject Hawthorn Suites location states: "DO NOT RECOMMEND!!...The staff at this hotel are very rude, there are maney

prostitutes and pimps in their cars outside all hours of the night. Alot of bums outside sleeping on the side walks...”[21]

- A 2014 Yelp review for the subject Hawthorn Suites location states: “… during our overnight stay was this; braided hair, tight miniskirt /rock star, hooker-chick checking in ahead of us. Guy in the lobby who looked like he hasn't slept for about a month, staring blankly into space. Shady cigarette smokers peering over every balcony floor using our head as the ashtray as we walked to our room. Strange guy on his mobile with a dusty backpack pacing the parking lot (probably looking for that hooker)…”[22]

- A 2015 Yelp review for the subject Hawthorn Suites location states: “…Nasty. Homeless people hanging around outside. Hookers were outside on the stairs. Absolutely ridiculous how they run this place…”[23]

- A 2017 Yelp review for the subject Hawthorn Suites states: “…During the night, my stay took a turn for the worst! Different women were entering the room next door and having sex with the men that entered with them. Like clockwork, every hour on the dot there would be a different group. I noticed ONE regular male voice conducting the appointments and discussing services with the "John's" before they went inside the room. It didn't take me long to figure out that these prostitutes had chosen the room next door to operate out of. This lasted an entire evening from 7 pm to 3 am. I had to turn turn up the television to drown out the noise. Realizing this wasn't drowning out the noise, I tried using my headphones. Constant banging on the wall and yelling was a constant, my night was ruined. BE WARNED, this is NOT a hotel you want to sleep at. You seriously risk ruining your trip.”[24]

- A 2018 Yelp review for the subject Hawthorn Suites states, “Absolutely the worst - it was like a real life episode of Walking Dead. This place is full of pimps, prostitutes, meth addicts, and homeless people. When I walked into my room, I was hit with the overwhelming smell of cigarettes, alcohol, marijuana, general pungent musk, and potentially febreeze. There was a dead roach and dead beetle on the carpet, massive black stains everywhere, a silver fish in the bathtub, and the sheets smelled horrible. My friend stayed in another room and she told me she was chased by a homeless man to her building. Another friend also found dead cockroaches, as well as a visible impression in her bed indicating someone slept in her bed before she checked in and they forgot to fluff the sheets. Let's not mention the other homeless man having a total mental breakdown, screaming his head off. Our Uber driver expressed genuine concern

---

[21] https://www.yelp.com/biz/hawthorn-suites-by-wyndham-sacramento-sacramento
[22] https://www.yelp.com/biz/hawthorn-suites-by-wyndham-sacramento-sacramento
[23] https://www.yelp.com/biz/hawthorn-suites-by-wyndham-sacramento-sacramento
[24] https://www.yelp.com/biz/hawthorn-suites-by-wyndham-sacramento-sacramento

for us when they picked us up, saying that this is a horrible spot to be in. You've been warned!"[25]

- A 2019 Yelp review of the subject Hawthorn Suites, states, "…The hotel on the outside look nice the surroundings though was full of homeless people, it's like people on drugs, people begging, and look like prostitution in and around Hotel…"[26]

- A 2019 Yelp review of the subject Hawthorn Suites states: "This location is not clean and reputation for bed bugs. The rooms smell like smoke. Homeless and Prostitutes are right outside the hotel and make it very uncomfortable. Please thinks twice before booking here."[27]

46.     Traffickers, including Jane Doe (K.R.D.)'s trafficker, repeatedly chose to use the subject Wyndham location for their sex trafficking activity. As such, Defendants also knew or should have known about the pervasive sex trafficking at the Wyndham location based on obvious indicators of this activity.

47.     Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the subject Wyndham location named herein prior to Jane Doe (K.R.D.)'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

---

[25] https://www.yelp.com/biz/hawthorn-suites-by-wyndham-sacramento-sacramento
[26] https://www.yelp.com/biz/hawthorn-suites-by-wyndham-sacramento-sacramento
[27] https://www.yelp.com/biz/hawthorn-suites-by-wyndham-sacramento-sacramento

48.    All knowledge from the staff at these subject Wyndham location is imputed to Wyndham Defendant. Wyndham Defendant knew about this widespread and ongoing trafficking at these Wyndham locations, including the trafficking of Jane Doe (K.R.D.), through the direct observations of hotel staff, including management-level staff.

49.    Upon information and belief, the Wyndham Defendant knew or should have known about the widespread trafficking at the subject Wyndham locations referenced herein, based on:

   a. The obligation of hotel staff and hotel management to report suspected criminal activity including sex trafficking to the Wyndham Defendant;

   b. The Defendants' regular monitoring of online reviews;

   c. The Defendants' collection and monitoring of customer surveys and complaints;

   d. The Defendants' regular inspections of the hotel property;

   e. Information provided to Defendants by law enforcement; and

   f. Other sources of information available to Defendants.

50.    Upon information and belief, under the Wyndham Defendant's protocols, which on their face required hotel staff and management to report suspected criminal activity to the Wyndham Defendant, hotel staff and management were required to report numerous instances of suspected sex trafficking to the Wyndham Defendant prior to Jane Doe (K.R.D.)'s trafficking based on the numerous "red flags" exhibited by the victims who were exploited at the subject Wyndham locations.

   **c. Defendants knew the venture that resulted in Jane Doe (K.R.D.)'s trafficking was operating at the subject Wyndham location because of the apparent and obvious "red flags" of sex trafficking.**

51.    During the period that Jane Doe (K.R.D.) was trafficked at the subject Wyndham locations named herein, there were obvious signs that her traffickers were engaged in sex trafficking:

a. The hotel was in an area known for prostitution. Women and their pimps were constantly hanging out in the parking lot smoking weed and waiting for Johns. Women, including Jane Doe (K.R.D.) would walk to the front desk to obtain the room while their traffickers waiting in the parking lot in their cars to keep watch of the heavy traffick of johns that would come to and from the rooms.

b. Other girls were trafficked at the same hotel at the same time as Jane Doe (K.R.D.);

c. There was constant fighting in the parking lots at all hours of the day where the hotel staff could hear pimps yelling profanities at the women and could see the pimps physically beat the women, including Jane Doe (K.R.D).

d. Rooms were specifically requested away from the lobby allowing easy access for johns to come in and out of Jane Doe (K.R.D.)'s room.

e. Jane Doe (K.D.R.) was forced to wear provactive and revealing clothing.

f. Housekeeping saw an excessive amount of condoms in the trash can as well as drug paraphinellia and could smell marijuana from outside the Jane Doe (K.R.D.)'s room.

g. Even though Jane Doe (K.R.D.) and her traffickers would stay for multiple days at a time, clean towels and sheets were frequently requested daily;

h. There was heavy foot traffic in and out of Jane Doe (K.R.D.)'s room involving men who were not hotel guests;

i. Jane Doe (K.R.D.) was forced to see 5 to 6 johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time; and

j. Other obvious signs of trafficking consistent with the modus operandi of her traffickers and which included well known "red flags" for trafficking in a hotel.

52.     Based upon information and belief, multiple employees at the subject Hawthorn Suites, including management-level employees, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

53.     As such, while not required under the statute, Wyndham knew or was willfully blind to the fact that Jane Doe (K.R.D.) was being trafficked at the Hawthorn Suites.

54.    Given these obvious signs, Wyndham knew or should have known about the trafficking of Jane Doe (K.R.D.) based on its policy or protocol that required hotel staff to report suspected criminal activity including sex trafficking.

**IV.    Defendants actively facilitated sex trafficking at the Hawthorn Suites location that resulted in the trafficking of Jane Doe (K.R.D.).**

55.    Wyndham had both actual and constructive knowledge of the trafficking of Jane Doe (K.R.D.) at this Wyndham location because the trafficking was the direct result of Wyndham Defendant facilitating her trafficking at the Wyndham location.

**a.  Franchisee Defendant facilitated the trafficking of Jane Doe (K.R.D.).**

56.    Franchisee Defendant is responsible for the acts, omissions, and knowledge of all employees of the Hawthorn Suites when operating the hotel because these acts and omissions were committed in the course and scope of employment, because Franchisee Defendant ratified these acts and omissions, and because Franchisee Defendant failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Franchisee Defendant, of sex trafficking occurring at the Hawthorn Suites branded locations including the subject location.

57.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject Hawthorn Suites, Franchisee Defendant continued renting rooms to these traffickers, including the rooms used to sexually exploit victims such as Jane Doe (K.R.D.).

58.    Franchisee Defendant knew or was willfully blind to the fact that Jane Doe (K.R.D.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (K.R.D.)'s sexual exploitation.

59.    Franchisee Defendant also facilitated widespread trafficking at their subject Hawthorn Suites, including the trafficking of Jane Doe (K.R.D.), in ways including:

   a.  allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

   b.  inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

   c.  choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures; and

   d.  implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

**b.  Wyndham Defendant facilitated the trafficking of Jane Doe (K.R.D.).**

60.    Wyndham Defendant is responsible for the acts, omissions, and knowledge of all employees of these Wyndham locations when operating the hotel because these acts and omissions were committed in the course and scope of employment, because Wyndham Defendant ratified these acts and omissions, and because Wyndham Defendant failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Wyndham Defendant, of sex trafficking occurring at these Wyndham branded locations including the subject Hawthorn Suites.

61.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject Hawthorn Suites, Wyndham Defendant continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

62.    Wyndham Defendant knew or were willfully blind to the fact that Jane Doe (K.R.D.) was being trafficked and, despite this, benefited from continued association with her

traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (K.R.D.)'s sexual exploitation.

63.    Wyndham Defendant also facilitated widespread trafficking at their subject Wyndham location, including the trafficking of Jane Doe (K.R.D.), in ways including:

a.  allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

b.  inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

c.  choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures; and

d.  implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

64.    Upon information and belief, Wyndham Defendant participated directly in aspects of the operation of the subject Wyndham that influenced whether and to what extent trafficking occurred at the hotels, including but not limited to the trafficking of Jane Doe (K.R.D.), as follows:

a.  The Wyndham Defendant has publicly assumed responsibility and control over the human trafficking response of all Wyndham properties, including design and implementation of practices to prevent trafficking, safety and security procedures, employee and franchisee education, training, and response, partnership with external organizations, and advocacy;

b.  The Wyndham Defendant retained control over when its branded hotels would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in Wyndham branded hotels;

c.  The Wyndham Defendant retained control over the response to trafficking by creating a reporting hotline for hotel staff and franchisees to report suspected human trafficking to the Wyndham Defendant. The Wyndham Defendant determined when issues should be escalated to the National Human Trafficking Hotline or law enforcement;

d. The Wyndham Defendant retained control over determining which hotels needed additional training or other resources based on a high risk of human trafficking and other related criminal activity;

e. The Wyndham Defendant expressly retained control to terminate hotel staff and/or a franchising agreement based on the response to human trafficking;

f. The Wyndham Defendant retained control, at the brand-wide level, over training on how to spot the signs of and help prevent human trafficking. The Wyndham Defendant determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives the training, and the consequences if someone does not participate in the training or fails to follow such training;

g. Although they delayed making any reasonable effort to do so, the Wyndham Defendant acknowledge that they retain control to adopt requirements for franchised hotels specifically designed to prevent human trafficking and other criminal activity;

h. The Wyndham Defendant maintain a Safety & Security Team and a Critical Incident Rapid Response Team that are charged with investigating and responding to potential criminal incidents at all Wyndham properties, including suspected trafficking incidents;

i. The Wyndham Defendant is responsible for adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking at the subject Wyndham location;

j. The Wyndham Defendant maintained control over all details of the terms under which franchised hotels, including the subject Wyndham location, offered internet services to customers, including dictating the software, hardware, and service provider to be used, setting all policies about use and restrictions on use, and actively collecting and monitoring guest internet usage data. The Wyndham Defendant dictated whether sites frequently used to solicit clients for sex trafficking victims would be accessible through the internet at the subject Wyndham location;

k. The Wyndham Defendant retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the subject Wyndham location, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services; and

l. The Wyndham Defendant collected, maintained, and analyzed detailed data regarding housekeeping services at the subject Wyndham location, including trends that would reveal patterns consistent with human trafficking.

65.    Wyndham directly participated in and retained day-to-day control over renting rooms at the subject Hawthorn Suites by, among other things:

a.    The Wyndham Defendant controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

b.    The Wyndham Defendant directly made reservations for rooms at the subject Hawthorn Suites and accepted payment for those rooms through a central reservation system that they controlled and operated. The Wyndham Defendant could reserve rooms and accept payments without requiring franchisee approval or involvement;

c.    The Wyndham Defendant established and maintained control over a brand-wide "do not rent" system. The Wyndham Defendant set all policies related to use of this system and dictated the day-to-day details of reservations at the subject Wyndham locations through detailed policies that it established regarding use of this "do not rent" system;

d.    The Wyndham Defendant controlled room rates, required discounts, mandatory fees, and rewards program;

e.    The Wyndham Defendant controlled and restricted the ability of franchisee and staff to refuse or cancel a reservation;

f.    The Wyndham Defendant controlled and oversaw policies and procedures regarding check-in, payment, and identity verification procedures;

g.    The Wyndham Defendant collected, retained, monitored, and analyzed detailed data about every guest who stayed at the subject Hawthorn Suites;

h.    The Wyndham Defendant established detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the subject Wyndham location until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in; and

i.    The Wyndham Defendant required franchisees to use Wyndham's property management system, which was owned, maintained, controlled, and operated by the Wyndham Defendant, for virtually all aspects of hotel operations regarding room reservations and payment.

66.     Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject Wyndham locations named herein, Wyndham continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including Jane Doe (K.R.D.).

67.     Wyndham knew or should have known that Jane Doe (K.R.D.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate Jane Doe (K.R.D.)'s sexual exploitation.

68.     Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the subject Wyndham location, the Wyndham Defendant continued participating in a venture at these hotels, with its franchisees and hotel staff, in a way that it knew or should have known would lead to additional sex trafficking at the hotels, including but not limited to by the following:

   a. The Wyndham Defendant adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining franchisees and hotel staff regarding issues related to human trafficking;

   b. The Wyndham Defendant provided inadequate training on issues related to human trafficking and unreasonably delayed providing training;

   c. The Wyndham Defendant adopted a safety and security budget and safety and security practices that were clearly insufficient considering the known problem of sex trafficking at Wyndham properties;

   d. The Wyndham Defendant implicitly approved decisions by franchisees and hotel staff not to report or respond to criminal activity including sex trafficking appropriately;

   e. The Wyndham Defendant continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the subject Wyndham location;

   f. The Wyndham Defendant attracted traffickers by affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal;

   g. Despite having specific knowledge of policies that would significantly reduce sex trafficking at its branded locations including the subject Wyndham location, the Wyndham Defendant declined to implement policies that would likely have the

effect of reducing its sex-trafficking related profits or that would require publicly acknowledging the ongoing problem of sex trafficking at its properties;

h.  The Wyndham Defendant willfully delayed taking obvious and apparent steps to stop facilitating sex trafficking, which they had the ability and responsibility to take sooner;

i.  The Wyndham Defendant allowed traffickers to reserve rooms using cash, which provided relative anonymity and non-traceability; and

j.  The Wyndham Defendant provided traffickers with access to internet services in a manner that the Wyndham Defendant knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

69.    If Wyndham had exercised reasonable diligence when operating their Wyndham properties and in the areas where it retained control, Wyndham would have prevented the subject Wyndham location from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (K.R.D.). Instead, Wyndham engaged in the course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (K.R.D.).

**V.    Defendants' Ventures at the Hawthorn Suites property.**

70.    Through the conduct described above, Wyndham Defendant knowingly benefited from engaging in a venture with sex traffickers at the Hawthorn Suites named herein, including Jane Doe (K.R.D.)'s traffickers, as follows:

a.  Wyndham and Franchisee Defendants both received benefits, including increased revenue, every time a room was rented at any Wyndham locations;

b.  This venture engaged in violations of 18 U.S.C. §1591 through the actions of the criminal traffickers at the Wyndham location, which Wyndham and Franchisee Defendants knew or should have known about;

c.  Wyndham and Franchisee Defendants associated with traffickers, including Jane Doe (K.R.D.)'s traffickers, by acting jointly to continue to rent rooms to these traffickers despite having actual or constructive knowledge of their sex trafficking activity;

d.  Wyndham and Franchisee Defendants had a mutually beneficial relationship with the traffickers at the Wyndham location, fueled by sexual exploitation of victims, including Jane Doe (K.R.D.);

e.  Sex traffickers, including Jane Doe (K.R.D.)'s traffickers, frequently used the Wyndham location for their trafficking because of an implicit understanding that the Wyndham location was an avenue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection. This understanding occurred because of the conduct of Wyndham and Franchisee Defendants facilitating that trafficking as described throughout this Complaint. This resulted in benefits, including increased revenue, for Wyndham and Franchisee Defendants;

f.  Wyndham and Franchisee Defendants participated in this venture through the conduct described throughout Plaintiff's Original Complaint, as they were jointly responsible for relevant aspects of hotel operations; and

g.  Jane Doe (K.R.D.)'s trafficking at the subject Wyndham location was a result of Wyndham and Franchisee Defendants' participation in a venture with criminal traffickers. If Wyndham and Franchisee Defendants had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Jane Doe (K.R.D.)'s trafficking at the subject Wyndham location.

71.  Through the conduct described above, Wyndham also knowingly benefited from engaging in a commercial venture with Franchisee Defendant operating the Hawthorn Suites as follows:

a.  Wyndham associated with Franchisee Defendant to operate the Hawthorn Suites location;

b.  Pursuant to the terms of the franchising agreement, both Wyndham and Franchisee Defendants received financial benefits from operating the Hawthorn Suites, including revenue generated specifically by renting rooms to traffickers. They engaged in revenue sharing and had a common incentive to maximize revenue;

c.  By participating in a venture that facilitated sex trafficking, each Wyndham and Franchisee also benefitted by keeping operating costs low, maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade and by not acknowledging the pervasive nature of sex trafficking in their hotels generally and the subject Hawthorn Suites location;

d.  This venture violated 18 U.S.C. §§ 1591(a) and 1595(a) through the conduct of Franchisee Defendant and the widespread sex trafficking at the subject Hawthorn Suites location named herein;

e.  Despite its actual or constructive knowledge that the venture was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), Wyndham participated in the venture by continuing to associate with Franchisee Defendant to operate the Hawthorn Suites location named herein in a way that it knew or should have known would lead to further violations of 18 U.S.C. §1591(a), including trafficking of victims like Jane Doe (K.R.D.); and

f.  Jane Doe (K.R.D.)'s trafficking at the Hawthorn Suites location named herein was a result of Wyndham and Franchisee Defendants' facilitation of the widespread and ongoing violations of 18 U.S.C. §§ 1591(a) and 1595(a) at the Hawthorn Suites. Had Wyndham not continued participating in a venture that it knew or should have known was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), it would not have received a benefit from Jane Doe (K.R.D.)'s trafficking at the Hawthorn Suites location named herein.

## VI. Franchisee Defendant and the Staff at the Hawthorn Suites Location Named Herein Acted as Actual Agents of Wyndham.

72.    Wyndham is vicariously liable for the acts, omissions, and knowledge of Franchisee and staff at the subject Hawthorn Suites named herein, which are Wyndham's actual agents or subagents.

73.    The Wyndham Defendant subjected Franchisee Defendant to detailed standards and requirements regarding the operation of the subject Hawthorn Suites location named herein through the franchising agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the Wyndham Defendant.

74.    The Wyndham Defendant obscured the full extent of control they exercise over the franchisee by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that the Wyndham Defendant imposed on the franchisee:

a.  did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendant used at the subject Hawthorn Suites location;

b.  covered virtually all aspects of hotel operations, including internal operating functions;

c.  dictated the specific manner in which Franchisee Defendant and hotel staff must carry out most day-to-day functions at the subject Hawthorn Suites; and

d.  significantly exceeded what was necessary for Wyndham to protect its registered trademarks.

75.    In addition to the ways described above, upon information and belief, Wyndham exercised and reserved the right to exercise systemic and pervasive control over Franchisee Defendant's day-to-day operation of the subject Hawthorn Suites location named herein, including the following ways:

a.  The Wyndham Defendant required franchisee and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for the Wyndham Defendant to protect their registered trademarks;

b.  The Wyndham Defendant provided training for hotel management and select hotel staff on-site at the subject Hawthorn Suites and at locations selected by the Wyndham Defendant;

c.  The Wyndham Defendant required all hotel staff to participate in training it created through an online learning platform it controlled and maintained;

d.  The Wyndham Defendant controlled training provided by franchisees to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e.  The Wyndham Defendant retained sole discretion to determine whether all training had been completed satisfactorily;

f.  For certain products and services that franchisee were required to purchase to operate the subject Hawthorn Suites location named herein, the Wyndham Defendant designated approved vendors and prohibited franchisees from purchasing goods and services from anyone other than an approved vendor;

g.  The Wyndham Defendant required franchisee to sign a technology agreement governing the terms under which franchisee must procure and use technical services and software while operating the subject Hawthorn Suites location named herein. Franchisee was required to install, and use certain brands, types, makes, and/or models of hardware, software, peripheral equipment, and support services to perform internal operating functions at the hotel;

26

h.  The Wyndham Defendant set required staffing levels for the subject Hawthorn Suites location named herein;

i.  The Wyndham Defendant established detailed job descriptions for all positions in its Hawthorn Suites property and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

j.  The Wyndham Defendant set requirements for the hiring process used by franchisee and oversaw employee discipline processes and termination decisions;

k.  The Wyndham Defendant provided benefits for employees of franchised hotels;

l.  The Wyndham Defendant required Defendant Franchisee to use a customer resource management program maintained and operated by the Wyndham Defendant;

m.  The Wyndham Defendant controlled channels for guests to report complaints or provide feedback regarding the subject Hawthorn Suites location and directly participated in the response and/or supervised the response to customer complaints or other feedback. The Wyndham Defendant retained the right to provide refunds or other compensation to guests and to require Defendant Franchisee to pay associated costs;

n.  The Wyndham Defendant generated reports and analysis of guest complaints and online reviews for the subject Hawthorn Suites;

o.  The Wyndham Defendant required Defendant Franchisee to use a Guest Relations Application owned, operated, and maintained by the Wyndham Defendants to manage all guest data and information. The Wyndham Defendant could use the backend of this system to analyze data and generate reports;

p.  The Wyndham Defendant set detailed requirements for insurance that franchisees must purchase and retain the right to purchase insurance for franchisees and to bill franchisees directly for that insurance if the Wyndham Defendant determined that the franchisees have not purchased adequate insurance;

q.  The Wyndham Defendant regularly audited the books and records of Defendant Franchisee;

r.  The Wyndham Defendant conducted frequent and unscheduled inspections of Hawthorn Suites properties, including the subject Hawthorn Suites named herein;

s.  The Wyndham Defendant retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreements if franchisees violated any of the Wyndham Defendants' detailed rules,

expectations, protocols, or policies, including those that governed day-to-day operations of the subject Hawthorn Suites location named herein;

t.  The Wyndham Defendant controlled all marketing for the subject Hawthorn Suites and prohibited franchisees from maintaining any online presence unless specifically reviewed and approved by the Wyndham Defendant;

u.  The Wyndham Defendant imposed detailed recordkeeping and reporting requirements on Defendant Franchisee regarding virtually all aspects of hotel operations;

v.  The Wyndham Defendant supervised and controlled day-to-day operations of the subject Hawthorn Suites named herein through detailed information and extensive reports that it obtained through the property management system and other software systems it required Defendant Franchisee to use; and

w.  The Wyndham Defendant retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

## VII.    Defendants are Jointly and Severally Liable for Jane Doe (K.R.D.)'s Damages.

76.     The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Jane Doe (K.R.D.).

77.     Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Jane Doe (K.R.D.) for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

## CAUSE OF ACTION—SEX TRAFFICKING UNDER THE TVPRA

78.     Jane Doe (K.R.D.)  incorporates all previous allegations.

## I.    Count 1: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a).

79.     Jane Doe (K.R.D.) is a victim of sex trafficking within the meaning of §1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

80.     Wyndham and Franchisee Defendants are perpetrators within the meaning of 18 U.S.C §1595(a) because Wyndham and Franchisee Defendants:

a. violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, it harbored individuals (including Jane Doe (K.R.D.)) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at its respective hotel property; and

b. violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, it knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at its respective hotel properties.

81. Violations of 18 U.S.C §1595(a) by each of the Defendants as "perpetrators" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (K.R.D.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel property.

## II.    Count 2: Beneficiary Liability under §1595 (a) of the TVPRA.

82. Jane Doe (K.R.D.) is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

83. Through acts and omissions described throughout this Complaint, Franchisor Defendant and Franchisee Defendant received a financial benefit from participating in a venture with traffickers, including Jane Doe (K.R.D.)'s traffickers, despite the fact that each defendant knew or should have known that these traffickers, including Jane Doe (K.R.D.)'s traffickers, were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2). Thus, Franchisor Defendant and Franchisee Defendant are liable as a beneficiary under 18 U.S.C §1595(a).

84. Through the acts and omissions described throughout this Complaint, Franchisor Defendant received a financial benefit from participating in a venture with its respective

franchisees regarding the operations of its respective hotel properties even though Franchisor Defendant knew or should have known that this venture was violating 18 U.S.C §§ 1591(a) and 1595(a).

85.    Violations of 18 U.S.C §1595(a) by Wyndham Defendant as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (K.R.D.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

**III.    Count 3: Vicarious Liability for TVPRA Violations.**

86.    Franchisee Defendant acted as the actual agent of its respective Franchisor Defendant when operating its respective hotel property.

87.    Through the acts and omissions described throughout this Complaint, Franchisor Defendant exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by its franchisee to operate its respective hotel property.

88.    Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agents and its subagents.

89.    Franchisor Defendant is vicariously liable for the TVPRA violations of its franchisee and the subagents of that franchisee.

90.    As alleged above, Wyndham is directly liable to Jane Doe (K.R.D.) for violations of the TVPRA, both as a perpetrator under 18 U.S.C §1591(a) and as a beneficiary under 18 U.S.C §1595(a). Franchisee Defendant are also directly liable to Jane Doe (K.R.D.) under § 2255. G6 is vicariously liable to Jane Doe (K.R.D.) for those same violations.

<u>**DAMAGES**</u>

91.    Wyndham and Franchisee Defendants' acts and omissions, individually and collectively, caused Jane Doe (K.R.D.) to sustain legal damages.

92.    Wyndham and Franchisee Defendants are joint and severally liable for all past and future damages sustained by Jane Doe (K.R.D.).

93.    Jane Doe (K.R.D.) is entitled to be compensated for personal injuries and economic damages, including:

    a.  Actual damages (until trial and in the future);

    b.  Incidental and consequential damages (until trial and in the future);

    c.  Mental anguish and emotional distress damages (until trial and in the future);

    d.  Lost earnings and lost earning capacity (until trial and in the future);

    e.  Necessary medical expenses (until trial and in the future);

    f.  Life care expenses (until trial and in the future);

    g.  Physical pain and suffering (until trial and in the future);

    h.  Physical impairment (until trial and in the future);

    i.  Exemplary/Punitive damages;

    j.  Attorneys' fees;

    k.  Costs of this action; and

    l.  Pre-judgment and all other interest recoverable.

## JURY TRIAL

94.    Jane Doe (K.R.D.) demands a jury trial on all issues.

## RELIEF SOUGHT

95.    WHEREFORE, Jane Doe (K.R.D.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (K.R.D.) against all

Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe (K.R.D.) may, in law or in equity, show herself to be justly entitled.

Respectfully submitted,

**THE LOCKS LAW FIRM**

/s/ Francesca A. Iacovangelo
Francesca A. Iacovangelo, Esq.
601 Walnut Street, Suite 720 E
Philadelphia, PA 19106
(215) 893-3454
(215) 893-3444 Facsimile
fiacovangelo@lockslaw.com

**ATTORNEYS FOR PLAINTIFF**