**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

JANE DOE (K.R.D.) an individual,

Plaintiff,

v.

WYNDHAM HOTELS & RESORTS, INC.
and BA Hotel, LLC,

Defendants.

Civil Action No. 2:24-cv-08174-SDW-JBC

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiff Jane Doe (K.R.D.)  files this First Amended Complaint against WYNDHAM

HOTELS & RESORTS, INC. and BA HOTEL, LLC, as Defendants and respectfully shows the

Court as follows:

**SUMMARY**

1.      Jane Doe (K.R.D.) files this civil lawsuit seeking compensation for the harm she

suffered as a result of the sex trafficking she endured at a Hawthorn Suites hotel franchised, owned,

operated, maintained, and controlled by Defendants and their agents and employees.

2.      Sex trafficking is the recruitment, harboring, transportation, provision, obtaining,

patronizing, or soliciting of a person for the purposes of causing the person to engage in a

commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or

coercion.[1] Traffickers use threats, violence, manipulation, lies, debt bondage, and other forms of

coercion to compel adults and children to engage in commercial sex acts against their will.

3.      Sex trafficking has become a public health crisis that has reached epidemic

proportions in the United States. It is now widely recognized, including by Congress and many

---

[1] 18 U.S.C. § 1591; 22 U.S.C. § 7102.

1

state legislatures, that combating sex trafficking requires more than just criminal penalties for traffickers and sex buyers.

4.      Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

5.      In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

6.      As discussed herein, Defendants derived financial benefit from facilitating sex trafficking by providing venues where traffickers could exploit victims, including victims like Jane Doe (K.R.D.), with minimal risk of detection or interruption. Defendants continued supporting traffickers, including Jane Doe (K.R.D.)'s trafficker, despite evident and apparent signs of widespread and ongoing sex trafficking in these hotels. Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

**PARTIES**

7.      Plaintiff, Jane Doe (K.R.D.) is a resident of California. She may be contacted through her lead counsel, whose information is contained below.

8.      Jane Doe (K.R.D.) is a victim of sex trafficking under 18 U.S.C. § 1591(a) because she was harbored, transported, or provided for the purpose of causing her, through force, fraud or coercion, to commit a commercial sex act.

2

9.      Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of Jane Doe (K.R.D.).

10.     Wyndham Hotels & Resorts, Inc. ("Wyndham") is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey. Wyndham has been served and has made an appearance in this lawsuit.

11.     All references to Wyndham include any department, division, office, agency, subsidiary, corporate affiliate, predecessor corporation, or successor corporation, whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority or implied/apparent authority), employee, person, firm, or corporation acting on behalf of Wyndham now or at any time relevant to the claims herein.

12.     BA Hotel, LLC is a for-profit California Limited Liability Company with its principal place of business in Fullerton, California. BA Hotel, LLC has been served and made an appearance in this lawsuit.  BA Hotel, LLC, will be referred to as "Franchisee" or "Franchisee Defendant."

## JURISDICTION AND VENUE

13.      This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because one or more Defendants reside in this district.

15.     Wyndham's principal place of business is in Parsippany, New Jersey, within the District of New Jersey. Therefore, Wyndham is a resident of the District of New Jersey for purpose of 28 U.S.C. § 1391(b)(1) and § 1391(c).

16.     Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the District of

3

New Jersey, including decisions, policies, standards, training, and operational controls directed and implemented by Wyndham from its headquarters in this district that are alleged to have facilitated sex trafficking at the subject hotel and caused Plaintiff's injuries.

17.     Plaintiff's claims against Franchisee arise out of Franchisee's participation in the operation of a Wyndham-branded hotel subject to Wyndham's direction and control. Upon information and belief, Wyndham's franchise relationship with Franchisee, including the standards, systems, and requirements governing the operation of the subject hotel, was administered and directed from Wyndham's headquarters in New Jersey, and those New Jersey-based acts and omissions form a substantial part of the conduct giving rise to Plaintiff's claims.

18.     Upon information and belief, Franchisee contractually consented to jurisdiction in the District of New Jersey.

**STATEMENT OF FACTS**

I.     **Jane Doe (K.R.D.) is a Survivor of Unlawful Sex Trafficking at a Hotel Owned, Operated, Managed and Controlled by Defendants.**

19.     Jane Doe (K.R.D.) was trafficked through force and coercion by her trafficker to engage in numerous commercial sex acts.  Jane Doe (K.R.D.)'s trafficker pretended to be her boyfriend, but used physical violence and their romantic relationship to coerce and force Jane Doe (K.R.D.) to engage in commercial sex.  Jane Doe (K.R.D.)'s trafficker controlled her by regularly beating her, withholding food, and preventing her from holding her infant child unless she returned to her trafficker with enough money.  In total, Jane Doe (K.R.D.) was trafficked continuously from April 2014 through May 2016. Jane Doe (K.R.D.) was specifically trafficked from April 2014 through November 2015 at the following Wyndham location:

> a. BA Hotel, LLC d/b/a Hawthorn Suites, located at 321 Bercut Drive, Sacramento, CA 95814.

4

20.      Jane Doe (K.R.D.)'s trafficking repeatedly occurred in rooms of the subject hotel and was facilitated by Wyndham.

**II.      The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.**

21.      While the widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what Wyndham knew or should have known regarding the trafficking at their hotel properties, the specific trafficking activity that resulted in the trafficking of Jane Doe (K.R.D.) was pervasive and apparent at the location at issue.

22.      Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[2] For years, sex traffickers have "been able to reap enormous profits with little risk when attempting to operate within hotels."[3] In 2014, 92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[4] Hotels have been found to account for over 90 percent of commercial exploitation of children.[5]

23.      Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.[6]

---

[2] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id*

[3] *See Human Trafficking in the Hotel Industry*, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

[4] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf

[5] Erika R. George & Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery*, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

[6] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *Red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

24.     Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and ECPAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[7]

25.     Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to:

    a.  Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

    b.  Individuals show signs of physical abuse, restraint, and/or confinement;

    c.  Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

    d.  Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

    e.  Individuals lack freedom of movement or are constantly monitored;

    f.  Individuals avoid eye contact and interaction with others;

    g.  Individuals have no control over or possession of money or ID;

    h.  Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

    i.  Individuals have few or no personal items—such as no luggage or other bags;

---

[7] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023);National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).

6

j.  Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

k.  A group of girls appears to be traveling with an older female or male;

l.  A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

m.  Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

n.  Possession of bulk sexual paraphernalia such as condoms or lubricant;

o.  Possession or use of multiple cell phones; and

p.  Possession or use of large amounts of cash or pre-paid cards.[8]

26.  The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Tool kits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[9] From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

27.  The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[10] It is also well understood, and specifically trained in hotel safety training courses, that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator: the exchange of sex for money.

---

[8] *Id.*

[9] Department of Homeland Security, *Blue Campaign Toolkit*, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

[10] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.

7

28.     The definition of sex trafficking in the TVPRA under 18 U.S.C. § 1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[11]

29.     All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of those hotels.

30.     The most effective weapon against sexual exploitation and human trafficking is education and training.[12]  As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[13]

31.     This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[14]  In reference to companies like the

---

[11] *Id.*

[12] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).

[13] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.

[14] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

32.    Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking necessary steps to identify and prevent trafficking in its hotels is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

33.    Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

34.    Unfortunately for Jane Doe (K.R.D.), the promises made by Defendants have proven empty. Defendants have failed, at all levels, to take appropriate action in response to their knowledge of widespread and ongoing human trafficking in their hotels. Instead, they have continued financially benefiting by providing venues for the sexual exploitation of victims like Jane Doe (K.R.D.).

### III.    Sex Trafficking Has Long Been Prevalent at Wyndham Branded Properties, and Defendants Have Known About It.

35.    Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants has known, since well before Jane Doe (K.R.D.)'s trafficking, that sex trafficking was ongoing and widespread at Wyndham branded properties including the subject hotel.

9

### a. Sex Trafficking at Wyndham Branded Hotels was well Known by Defendants

36. Upon information and belief, each of the Defendants monitored criminal activity occurring at Wyndham branded hotels and were aware of activity indicating commercial sex, sex trafficking and/or related crimes occurring at those branded hotels, including the subject hotel.

37. Scores of news stories from across the U.S. highlight Wyndham's facilitation of sex trafficking and establish that Defendants knew, or should have known, of the use of Wyndham hotels for sex trafficking.

38. Information that has become public through news stories establishes the entrenched and pervasive nature of Wyndham's role in providing a venue where sex trafficking has continued unabated for years. Among notable press involving the frequent use of Wyndham hotels for illegal activity, the following was noted:

- "Man arrested in Metairie on human trafficking charges; accused of forcing North Carolina teens into prostitution"[15]

- "Federal officials catch, arrest man alleged to have prostituted Jupiter girl, 14"[16]

- "Hagerstown man charged with trafficking of two teenage girls"[17]

39. Ultimately, several hundred traffickers involved with hundreds of victims have been prosecuted by state and federal law enforcement agencies for sex trafficking and forced prostitution out of Wyndham branded properties.

40. Based on information and belief, Wyndham managed and monitored on-line reviews of Wyndham hotel locations:

---

[15] *Man arrested in Metairie on human trafficking charges; accused of forcing North Carolina teens into   prostitution*, NOLA.com (Jul 20, 2010), Man arrested in Metairie on human trafficking charges; accused of forcing North Carolina teens into prostitution | Crime/Police | nola.com
[16] *Federal officials catch, arrest man alleged to have prostituted Jupiter girl, 14*, The Palm Beach Post (March 31, 2012) https://www.palmbeachpost.com/story/news/crime/2012/02/08/federal-officials-catch-arrest-man/7283405007/
[17] *Hagerstown man charged with trafficking of two teenage girls*, Herald Mail Media (July 1, 2015) Hagerstown man charged with trafficking of two teenage girls (heraldmailmedia.com)

- A Booking.com review from September 29, 2021 states: "Negative: The cops pulled us over after we left the parking lot. They told us that this motel was known fir [sic] drugs and sex rings"[18]

- A Google.com review from 2018 states: "Problem I have is owner. He treats women very poorly and makes his underage children work there. A lot of prostitution that I'm sure owner aware of. I seen him talking to this guy that has checked in 3 different times with 3 different [sic]"[19]

- A Trip Advisor review from June 20, 2014 states: "I witnessed what seemed to be prostitution in and out of the hotel. A huge party went on "in the hallways" well into the night with full tilt hip hop music. The following morning I experienced a naked woman being attacked in the hallway and had to intervene when not one other hotel security, management came to help."[20]

41.    This sampling of news stories, reviews, and other public information establishes that, at the time Jane Doe (K.R.D.) was trafficked at the subject hotel, Wyndham knew or should have known that:

    a.    There was widespread and ongoing sex trafficking occurring at Wyndham branded properties;

    b.    Sex trafficking was a brand-wide problem for Wyndham originating from management level decisions at their corporate offices;

    c.    Wyndham franchisees and hotel staff were not taking reasonable steps to identify, report, and respond to known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties;

    d.    Wyndham's efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective; and

---

[18] https://www.booking.com/hotel/us/days-inn-clarksville-tn.html

[19]https://www.google.com/travel/hotels/Days%20Inn%20127%20W%20Byers%20Ave,%20New%20Stanton,%20PA%2015672%20google/entity/CgoIiJGz_YeevpIDEAE/prices?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,4515404,4597339,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4886082,4886480,4893075,4902277,4905351,4926165,4926489,4931360,4936396,4937897,4940607,47061553&hl=en-US&gl=us&ssta=1&q=Days+Inn+127+W+Byers+Ave,+New+Stanton,+PA+15672+google&grf=EmMKLAgOEigSJnIkKiIKBwjnDxAEGBASBwjnDxAEGBEgADAeQMoCSgcI5w8QARgfCjMIDBIvEi2yASoSKAomCiQweDg4MzRkOTA1ZjM5OTA5YmQ6MHgzMjRmOGYwN2ZhY2M4ODg&rp=EIiRs_2Hnr6SAxCIkbP9h56-kgM4AkAASAHAAQI&ictx=1

[20] https://www.tripadvisor.com/Hotel_Review-g60097-d1571552-Reviews-Days_Inn_Suites_by_Wyndham_Milwaukee-Milwaukee_Wisconsin.html

11

e. Wyndham and its franchisees were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

42. Despite the mounting evidence that sex trafficking at its properties was ongoing and growing, Wyndham chose to earn revenue by continuing conduct that they knew or should have known would facilitate that trafficking.

**b. Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the subject hotel.**

43. Defendants were specifically aware that sex trafficking was widespread and ongoing at the subject hotel.

44. Internet reviews for the subject hotel, which upon information and belief Defendants managed and monitored, show the pervasiveness of sex trafficking before and well after Jane Doe (K.R.D.) was trafficked. For example:

- A 2012 Yelp review for the subject hotel states: "DO NOT RECOMMEND!!...The staff at this hotel are very rude, there are maney prostitutes and pimps in their cars outside all hours of the night. Alot of bums outside sleeping on the side walks..."[21]

- A 2014 Yelp review for the subject hotel states: "… during our overnight stay was this; braided hair, tight miniskirt /rock star, hooker-chick checking in ahead of us. Guy in the lobby who looked like he hasn't slept for about a month, staring blankly into space. Shady cigarette smokers peering over every balcony floor using our head as the ashtray as we walked to our room. Strange guy on his mobile with a dusty backpack pacing the parking lot (probably looking for that hooker)…"[22]

- A 2015 Yelp review for the subject hotel states: "…Nasty. Homeless people hanging around outside. Hookers were outside on the stairs. Absolutely ridiculous how they run this place…"[23]

- A 2017 Yelp review for the subject hotel states: "…During the night, my stay took a turn for the worst! Different women were entering the room next door and having sex with the men that entered with them. Like clockwork, every hour on the dot there would be a different group. I noticed ONE regular male

---

[21] https://www.yelp.com/biz/hawthorn-suites-by-wyndham-sacramento-sacramento
[22] https://www.yelp.com/biz/hawthorn-suites-by-wyndham-sacramento-sacramento
[23] https://www.yelp.com/biz/hawthorn-suites-by-wyndham-sacramento-sacramento

12

voice conducting the appointments and discussing services with the "John's" before they went inside the room. It didn't take me long to figure out that these prostitutes had chosen the room next door to operate out of. This lasted an entire evening from 7 pm to 3 am. I had to turn turn up the television to drown out the noise. Realizing this wasn't drowning out the noise, I tried using my headphones. Constant banging on the wall and yelling was a constant, my night was ruined. BE WARNED, this is NOT a hotel you want to sleep at. You seriously risk ruining your trip."[24]

- A 2018 Yelp review for the subject hotel states, "Absolutely the worst - it was like a real life episode of Walking Dead. This place is full of pimps, prostitutes, meth addicts, and homeless people. When I walked into my room, I was hit with the overwhelming smell of cigarettes, alcohol, marijuana, general pungent musk, and potentially febreeze. There was a dead roach and dead beetle on the carpet, massive black stains everywhere, a silver fish in the bathtub, and the sheets smelled horrible. My friend stayed in another room and she told me she was chased by a homeless man to her building. Another friend also found dead cockroaches, as well as a visible impression in her bed indicating someone slept in her bed before she checked in and they forgot to fluff the sheets. Let's not mention the other homeless man having a total mental breakdown, screaming his head off. Our Uber driver expressed genuine concern for us when they picked us up, saying that this is a horrible spot to be in. You've been warned!"[25]

- A 2019 Yelp review of the subject hotel states, "…The hotel on the outside look nice the surroundings though was full of homeless people, it's like people on drugs, people begging, and look like prostitution in and around Hotel…"[26]

- A 2019 Yelp review of the subject hotel states: "This location is not clean and reputation for bed bugs. The rooms smell like smoke. Homeless and Prostitutes are right outside the hotel and make it very uncomfortable. Please thinks twice before booking here."[27]

45.    Traffickers, including Jane Doe (K.R.D.)'s trafficker, repeatedly chose to use the subject hotel for their sex trafficking activity. As such, Defendants also knew or should have known about the pervasive sex trafficking at the subject hotel based on obvious indicators of this activity.

46.    Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the subject hotel prior to

---

[24] https://www.yelp.com/biz/hawthorn-suites-by-wyndham-sacramento-sacramento
[25] https://www.yelp.com/biz/hawthorn-suites-by-wyndham-sacramento-sacramento
[26] https://www.yelp.com/biz/hawthorn-suites-by-wyndham-sacramento-sacramento
[27] https://www.yelp.com/biz/hawthorn-suites-by-wyndham-sacramento-sacramento

13

Jane Doe (K.R.D.)'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who were not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

47.    All knowledge from the staff at the subject hotel is imputed to Wyndham. Wyndham knew about this widespread and ongoing trafficking at the subject hotel, including the trafficking of Jane Doe (K.R.D.), through the direct observations of hotel staff, including management-level staff.

48.    Upon information and belief, Wyndham knew or should have known about the widespread trafficking at the subject hotel based on:

    a.  The obligation of hotel staff and hotel management to report suspected criminal activity including sex trafficking to Wyndham;

    b.  The Defendants' regular monitoring of online reviews;

    c.  The Defendants' collection and monitoring of customer surveys and complaints;

    d.  The Defendants' regular inspections of the hotel property;

    e.  Information provided to Defendants by law enforcement; and

    f.  Other sources of information available to Defendants.

49.    Upon information and belief, under Wyndham's protocols, which on their face required hotel staff and management to report suspected criminal activity to Wyndham, hotel staff

14

and management were required to report numerous instances of suspected sex trafficking to Wyndham prior to Jane Doe (K.R.D.)'s trafficking based on the numerous "red flags" exhibited by the victims who were exploited at the subject hotel.

 **c. Defendants knew the venture that resulted in Jane Doe (K.R.D.)'s trafficking was operating at the subject hotel because of the apparent and obvious "red flags" of sex trafficking.**

50. During the period that Jane Doe (K.R.D.) was trafficked at the subject hotel, there were obvious signs that her trafficker was engaged in sex trafficking:

 a. The hotel was in an area known for prostitution. Women and their pimps were constantly hanging out in the parking lot smoking weed and waiting for Johns. Women, including Jane Doe (K.R.D.) would walk to the front desk to obtain the room while their traffickers waited in the parking lot in their cars to keep watch of the heavy traffic of johns that would come to and from the rooms;

 b. Other girls were trafficked at the same hotel at the same time as Jane Doe (K.R.D.);

 c. There was constant fighting in the parking lots at all hours of the day where the hotel staff could hear pimps yelling profanities at the women and could see the pimps physically beat the women, including Jane Doe (K.R.D.);

 d. Rooms were specifically requested away from the lobby allowing easy access for johns to come in and out of Jane Doe (K.R.D.)'s room;

 e. Jane Doe (K.R.D.) was forced to wear provocative and revealing clothing;

 f. Housekeeping saw an excessive amount of condoms in the trash can as well as drug paraphernalia and could smell marijuana from outside the Jane Doe (K.R.D.)'s room;

 g. Clean towels and sheets were frequently requested;

 h. There was heavy foot traffic in and out of Jane Doe (K.R.D.)'s room involving men who were not hotel guests;

 i. Jane Doe (K.R.D.) was forced to see 5 to 6 johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time; and

 j. Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel.

15

51.    Based upon information and belief, multiple employees at the subject hotel, including management-level employees, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

52.    As such, Wyndham knew or was willfully blind to the fact that Jane Doe (K.R.D.) was being trafficked at the subject hotel.

53.    Given these obvious signs, Wyndham knew or should have known about the trafficking of Jane Doe (K.R.D.) based on its policy or protocol that required hotel staff to report suspected criminal activity including sex trafficking.

**IV.    Defendants actively facilitated sex trafficking at the subject hotel that resulted in the trafficking of Jane Doe (K.R.D.).**

54.    Defendants had both actual and constructive knowledge of the trafficking of Jane Doe (K.R.D.) at the subject hotel because the trafficking was the direct result of Defendants' facilitating her trafficking at the subject hotel.

**a.    Franchisee Defendant facilitated the trafficking of Jane Doe (K.R.D.).**

55.    Franchisee Defendant is responsible for the acts, omissions, and knowledge of all employees of the subject hotel when operating the hotel because these acts and omissions were committed in the course and scope of employment, because Franchisee Defendant ratified these acts and omissions, and because Franchisee Defendant failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Franchisee Defendant, of sex trafficking occurring at Wyndham branded locations including the subject hotel.

56.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject hotel, Franchisee Defendant continued renting rooms to traffickers, including the rooms used to sexually exploit victims such as Jane Doe (K.R.D.).

16

57.     Franchisee Defendant knew or was willfully blind to the fact that Jane Doe (K.R.D.) was being trafficked and, despite this, benefited from continued association with her trafficker by providing him a venue in the form of hotel rooms and related services, to facilitate Jane Doe (K.R.D.)'s sexual exploitation.

58.     Franchisee Defendant also facilitated widespread trafficking at the subject hotel, including the trafficking of Jane Doe (K.R.D.), in ways including:

   a. allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

   b. inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

   c. choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures; and

   d. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

   **b. Wyndham facilitated the trafficking of Jane Doe (K.R.D.).**

59.     Wyndham is responsible for the acts, omissions, and knowledge of all employees of the subject hotel because these acts and omissions were committed in the course and scope of employment, because Wyndham ratified these acts and omissions, and because Wyndham failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Wyndham, of sex trafficking occurring at Wyndham branded locations including the subject hotel.

60.     Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject hotel, Wyndham continued renting rooms to traffickers, including the rooms used to sexually exploit victims such as Jane Doe (K.R.D.).

61.     Wyndham knew or was willfully blind to the fact that Jane Doe (K.R.D.) was being trafficked and, despite this, benefited from continued association with her trafficker by providing him a venue in the form of hotel rooms and related services, to facilitate Jane Doe (K.R.D.)'s sexual exploitation.

62.     Wyndham also facilitated widespread trafficking at the subject hotel, including the trafficking of Jane Doe (K.R.D.), in ways including:

a.  allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

b.  inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

c.  choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures; and

d.  implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

63.     Upon information and belief, Wyndham participated directly in aspects of the operation of the subject hotel that influenced whether and to what extent trafficking occurred at the subject hotel, including but not limited to the trafficking of Jane Doe (K.R.D.), as follows:

a.  Wyndham has publicly assumed responsibility and control over the human trafficking response of all Wyndham properties, including design and implementation of practices to prevent trafficking, safety and security procedures, employee and franchisee education, training, and response, partnership with external organizations, and advocacy;

b.  Wyndham retained control over when its branded hotels would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in Wyndham branded hotels;

c.  Wyndham retained control over the response to trafficking by creating a reporting hotline for hotel staff and franchisees to report suspected human trafficking to

18

Wyndham. Wyndham determined when issues should be escalated to the National Human Trafficking Hotline or law enforcement;

d. Wyndham retained control over determining which hotels needed additional training or other resources based on a high risk of human trafficking and other related criminal activity;

e. Wyndham expressly retained control to terminate hotel staff and/or a franchising agreement based on the response to human trafficking;

f. Wyndham retained control, at the brand-wide level, over training on how to spot the signs of and help prevent human trafficking. Wyndham determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives the training, and the consequences if someone does not participate in the training or fails to follow such training;

g. Although they delayed making any reasonable effort to do so, Wyndham acknowledges that they retain control to adopt requirements for franchised hotels specifically designed to prevent human trafficking and other criminal activity;

h. Wyndham maintains a Safety & Security Team and a Critical Incident Rapid Response Team that are charged with investigating and responding to potential criminal incidents at all Wyndham properties, including suspected trafficking incidents;

i. Wyndham is responsible for adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking at all Wyndham properties;

j. Wyndham maintained control over all details of the terms under which franchised hotels, including the subject hotel, offered internet services to customers, including dictating the software, hardware, and service provider to be used, setting all policies about use and restrictions on use, and actively collecting and monitoring guest internet usage data. Wyndham dictated whether sites frequently used to solicit clients for sex trafficking victims would be accessible through the internet at the subject hotel;

k. Wyndham retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at its hotels, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services; and

l. Wyndham collected, maintained, and analyzed detailed data regarding housekeeping services at its hotels, including trends that would reveal patterns consistent with human trafficking.

19

64.    Wyndham directly participated in and retained day-to-day control over renting rooms at the subject hotel by, among other things:

a.    Wyndham controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

b.    Wyndham directly made reservations for rooms at the subject hotel and accepted payment for those rooms through a central reservation system that they controlled and operated. Wyndham could reserve rooms and accept payments without requiring Franchisee's approval or involvement;

c.    Wyndham established and maintained control over a brand-wide "do not rent" system. Wyndham set all policies related to use of this system and dictated the day-to-day details of reservations at the subject hotel through detailed policies that it established regarding use of this "do not rent" system;

d.    Wyndham controlled room rates, required discounts, mandatory fees, and rewards program;

e.    Wyndham controlled and restricted the ability of Franchisee and staff to refuse or cancel a reservation;

f.    Wyndham controlled and oversaw policies and procedures regarding check-in, payment, and identity verification procedures;

g.    Wyndham collected, retained, monitored, and analyzed detailed data about every guest who stayed at the subject hotel;

h.    Wyndham established detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the subject hotel until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in; and

i.    Wyndham required Franchisee to use Wyndham's property management system, which was owned, maintained, controlled, and operated by Wyndham, for virtually all aspects of hotel operations regarding room reservations and payment.

65.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject hotel, Wyndham continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including Jane Doe (K.R.D.).

20

66.    Wyndham knew or should have known that Jane Doe (K.R.D.) was being trafficked and, despite this, benefited from continued association with her trafficker by providing him hotel rooms and related services to facilitate Jane Doe (K.R.D.)'s sexual exploitation.

67.    Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the subject hotel, Wyndham continued participating in a venture at the subject hotel, with Franchisee and hotel staff, in a way that it knew or should have known would lead to additional sex trafficking at the subject hotel, including but not limited to by the following:

a.    Wyndham adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining Franchisee and hotel staff regarding issues related to human trafficking;

b.    Wyndham provided inadequate training on issues related to human trafficking and unreasonably delayed providing training;

c.    Wyndham adopted a safety and security budget and safety and security practices that were clearly insufficient considering the known problem of sex trafficking at Wyndham properties;

d.    Wyndham implicitly approved decisions by Franchisee and hotel staff not to report or respond to criminal activity including sex trafficking appropriately;

e.    Wyndham continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the subject hotel;

f.    Wyndham attracted traffickers by affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal;

g.    Despite having specific knowledge of policies that would significantly reduce sex trafficking at its branded locations including the subject hotel, Wyndham declined to implement policies that would likely have the effect of reducing its sex-trafficking related profits or that would require publicly acknowledging the ongoing problem of sex trafficking at its properties;

h.    Wyndham willfully delayed taking obvious and apparent steps to stop facilitating sex trafficking, which it had the ability and responsibility to take sooner;

i.    Wyndham allowed traffickers to reserve rooms using cash, which provided relative anonymity and non-traceability; and

21

j.  Wyndham provided traffickers with access to internet services in a manner that Wyndham knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

68.  If Wyndham had exercised reasonable diligence when operating Wyndham properties and in the areas where it retained control, Wyndham would have prevented the subject hotel from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (K.R.D.). Instead, Wyndham engaged in the course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (K.R.D.).

**V.     Defendants' Ventures at the subject hotel.**

69.  Through the conduct described above, Defendants knowingly benefited from engaging in a venture with sex traffickers at the subject hotel, including Jane Doe (K.R.D.)'s trafficker, as follows:

a.  Wyndham and Franchisee both received benefits, including increased revenue, every time a room was rented at the subject hotel;

b.  This venture engaged in violations of 18 U.S.C. § 1591 through the actions of the criminal traffickers at the subject hotel, which Wyndham and Franchisee knew or should have known about;

c.  Wyndham and Franchisee associated with traffickers, including Jane Doe (K.R.D.)'s trafficker, by acting jointly to continue to rent rooms to these traffickers despite having actual or constructive knowledge of their sex trafficking activity;

d.  Wyndham and Franchisee had a mutually beneficial relationship with the traffickers at the subject hotel, fueled by sexual exploitation of victims, including Jane Doe (K.R.D.);

e.  Sex traffickers, including Jane Doe (K.R.D.)'s trafficker, frequently used the subject hotel for their trafficking because of an implicit understanding that the subject hotel was a venue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection. This understanding occurred because of the conduct of Wyndham and Franchisee facilitating that trafficking as described throughout this Complaint. This resulted in benefits, including increased revenue, for Wyndham and Franchisee;

22

f.  Wyndham and Franchisee participated in this venture through the conduct described throughout this Complaint, as they were jointly responsible for relevant aspects of hotel operations; and

g.  Jane Doe (K.R.D.)'s trafficking at the subject hotel was a result of Wyndham and Franchisee's participation in a venture with criminal traffickers. If Wyndham and Franchisee had not continued participating in a venture that they knew or should have known violated 18 U.S.C. § 1591(a), they would not have received a benefit from Jane Doe (K.R.D.)'s trafficking at the subject hotel.

70.  Through the conduct described above, Wyndham also knowingly benefited from engaging in a commercial venture with Franchisee operating the subject hotel as follows:

a.  Wyndham associated with Franchisee to operate the subject hotel;

b.  Pursuant to the terms of the franchising agreement, both Wyndham and Franchisee received financial benefits from operating the subject hotel, including revenue generated specifically by renting rooms to traffickers. They engaged in revenue sharing and had a common incentive to maximize revenue;

c.  By participating in a venture that facilitated sex trafficking, Wyndham and Franchisee also benefited by keeping operating costs low, maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade and by not acknowledging the pervasive nature of sex trafficking in their hotels generally and the subject hotel;

d.  This venture was engaged in sex trafficking in violation of 18 U.S.C. § 1591 through the conduct occurring at the subject hotel;

e.  Despite actual or constructive knowledge that the venture was engaged in sex trafficking in violation of 18 U.S.C. § 1591, Wyndham participated in the venture by continuing its franchise relationship with Franchisee and continuing to permit the subject hotel to operate under the Wyndham brand in a manner Wyndham knew or should have known would lead to further violations of 18 U.S.C. § 1591, including trafficking of victims like Jane Doe (K.R.D.); and

f.  Jane Doe (K.R.D.)'s trafficking at the subject hotel resulted from Wyndham's and Franchisee's facilitation of sex trafficking in violation of 18 U.S.C. § 1591 at the subject hotel, giving rise to civil liability under 18 U.S.C. § 1595(a). Had Wyndham not continued participating in a venture that it knew or should have known was engaged in sex trafficking in violation of 18 U.S.C. § 1591, it would not have received financial benefits from Jane Doe (K.R.D.)'s trafficking at the subject hotel.

VI.  **Franchisee Defendant and the Staff at the Subject Hotel Acted as Actual Agents of Wyndham.**

71.     Wyndham is vicariously liable for the acts, omissions, and knowledge of Franchisee and staff at the subject hotel, which are Wyndham's actual agents or subagents.

72.     Wyndham subjected Franchisee to detailed standards and requirements regarding the operation of the subject hotel through the franchising agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by Wyndham.

73.     Wyndham obscures the full extent of control they exercise over Franchisee by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that Wyndham imposed on Franchisee:

   a. did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee used at the subject hotel;

   b. covered virtually all aspects of hotel operations, including internal operating functions;

   c. dictated the specific manner in which Franchisee and hotel staff must carry out most day-to-day functions at the subject hotel; and

   d. significantly exceeded what was necessary for Wyndham to protect its registered trademarks.

74.     In addition to the ways described above, upon information and belief, Wyndham exercised and reserved the right to exercise systemic and pervasive control over Franchisee's day-to-day operation of the subject hotel, including the following ways:

   a. Wyndham required Franchisee to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for Wyndham to protect its registered trademarks;

   b. Wyndham provided training for hotel management and select hotel staff on-site at the subject hotel and at locations selected by Wyndham;

24

c.  Wyndham required all hotel staff to participate in training it created through an online learning platform it controlled and maintained;

d.  Wyndham controlled training provided by Franchisee to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e.  Wyndham retained sole discretion to determine whether all training had been completed satisfactorily;

f.  For certain products and services that Franchisee was required to purchase to operate the subject hotel, Wyndham designated approved vendors and prohibited Franchisee from purchasing goods and services from anyone other than an approved vendor;

g.  Wyndham required Franchisee to sign a technology agreement governing the terms under which Franchisee must procure and use technical services and software while operating the subject hotel. Franchisee was required to install, and use certain brands, types, makes, and/or models of hardware, software, peripheral equipment, and support services to perform internal operating functions at the subject hotel;

h.  Wyndham set required staffing levels for the subject hotel;

i.  Wyndham established detailed job descriptions for all positions in the subject hotel and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

j.  Wyndham set requirements for the hiring process used by Franchisee and oversaw employee discipline processes and termination decisions;

k.  Wyndham provided benefits for employees of the subject hotel;

l.  Wyndham required Franchisee to use a customer resource management program maintained and operated by Wyndham;

m.  Wyndham controlled channels for guests to report complaints or provide feedback regarding the subject hotel and directly participated in the response and/or supervised the response to customer complaints or other feedback. Wyndham retained the right to provide refunds or other compensation to guests and to require Franchisee to pay associated costs;

n.  Wyndham generated reports and analysis of guest complaints and online reviews for the subject hotel;

o.  Wyndham required Franchisee to use a Guest Relations Application owned, operated, and maintained by Wyndham to manage all guest data and information. Wyndham could use the backend of this system to analyze data and generate reports;

25

p.  Wyndham set detailed requirements for insurance that Franchisee must purchase and retained the right to purchase insurance for Franchisee and to bill Franchisee directly for that insurance if Wyndham determined that Franchisee had not purchased adequate insurance;

q.  Wyndham regularly audited the books and records of Franchisee;

r.  Wyndham conducted frequent and unscheduled inspections of the subject hotel;

s.  Wyndham retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreements if Franchisee violated any of Wyndham's detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the subject hotel;

t.  Wyndham controlled all marketing for the subject hotel and prohibited Franchisee from maintaining any online presence unless specifically reviewed and approved by Wyndham;

u.  Wyndham imposed detailed recordkeeping and reporting requirements on Franchisee regarding virtually all aspects of hotel operations;

v.  Wyndham supervised and controlled day-to-day operations of the subject hotel through detailed information and extensive reports that it obtained through the property management system and other software systems it required Franchisee to use; and

w.  Wyndham retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

## VII.    Defendants are Jointly and Severally Liable for Jane Doe (K.R.D.)'s Damages.

75.    The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Jane Doe (K.R.D.).

76.    Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Jane Doe (K.R.D.) for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

## CAUSE OF ACTION—SEX TRAFFICKING UNDER THE TVPRA

77.    Jane Doe (K.R.D.)  incorporates all previous allegations.

**I.    Count 1: Perpetrator liability under 18 U.S.C. § 1595(a) based on violation of 18 U.S.C. § 1591(a).**

26

78.     Jane Doe (K.R.D.) is a victim of sex trafficking within the meaning of §§ 1591 and is entitled to bring a civil action under 18 U.S.C. § 1595(a) against any perpetrator of a violation of the TVPRA.

79.     Wyndham and Franchisee are perpetrators within the meaning of 18 U.S.C. § 1595(a) because, in or affecting interstate commerce and through the acts and omissions described throughout this Complaint, they:

a.  violated 18 U.S.C. § 1591(a)(1) when they harbored and maintained individuals, including Jane Doe (K.R.D.), knowing, or in reckless disregard of the fact, that force, threats of force, fraud, and coercion would be used to cause the victims to engage in commercial sex acts at the subject hotel; and

b.  violated 18 U.S.C. § 1591(a)(2) when they knowingly benefited, financially or by receiving anything of value, from participation in a venture that they knew, or in reckless disregard of the fact, engaged in acts described in § 1591(a)(1) at the subject hotel.

80.     Defendants' violations of 18 U.S.C. § 1591, giving rise to liability under 18 U.S.C. § 1595(a), operated, jointly with the other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (K.R.D.) to suffer substantial physical and psychological injuries and other damages arising from being trafficked and sexually exploited at the subject hotel.

## II.     Count 2: Beneficiary Liability under § 1595(a) of the TVPRA.

81.     Jane Doe (K.R.D.) is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591 and is entitled to bring a civil action under 18 U.S.C. § 1595(a) against anyone who knowingly benefited, financially or by receiving anything of value, from participation in a venture that the person knew or should have known was engaged in a violation of the TVPRA.

82.     Through acts and omissions described throughout this Complaint, Wyndham and Franchisee knowingly benefited financially from participating in a venture with traffickers, including Jane Doe (K.R.D.)'s trafficker, and they knew or should have known that the venture

27

was engaged in sex trafficking in violation of 18 U.S.C. § 1591. Wyndham and Franchisee are therefore liable as beneficiaries under 18 U.S.C. § 1595(a).

83.    Through the acts and omissions described throughout this Complaint, Wyndham knowingly benefited financially from participation in a venture with Franchisee concerning the operations of the subject hotel, and Wyndham knew or should have known that this venture was engaged in sex trafficking at the subject hotel in violation of 18 U.S.C. § 1591.

84.    Defendants' conduct giving rise to liability under 18 U.S.C. § 1595(a) operated, jointly with the other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (K.R.D.) to suffer substantial physical and psychological injuries and other damages arising from being trafficked and sexually exploited at the subject hotel.

**III.    Count 3: Vicarious Liability for TVPRA Violations.**

85.    Franchisee acted as the actual agent of Wyndham when operating the subject hotel.

86.    Through the acts and omissions described throughout this Complaint, Wyndham exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by Franchisee to operate the subject hotel.

87.    Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agents and its subagents.

88.    Wyndham is vicariously liable for the TVPRA violations of Franchisee and the subagents of Franchisee.

89.    As alleged above, Wyndham is liable to Jane Doe (K.R.D.) under 18 U.S.C. § 1595(a) for the predicate violations of 18 U.S.C. § 1591. Franchisee is also liable to Jane Doe (K.R.D.) under 18 U.S.C. § 1595(a). In addition, Wyndham is vicariously liable for the TVPRA violations committed by its actual agents and subagents at the subject hotel.

28

## DAMAGES

90.    Wyndham and Franchisee's acts and omissions, individually and collectively, caused Jane Doe (K.R.D.) to sustain legal damages.

91.    Wyndham and Franchisee are joint and severally liable for all past and future damages sustained by Jane Doe (K.R.D.).

92.    Jane Doe (K.R.D.) is entitled to be compensated for personal injuries and economic damages, including:

     a.  Actual damages (until trial and in the future);

     b.  Incidental and consequential damages (until trial and in the future);

     c.  Mental anguish and emotional distress damages (until trial and in the future);

     d.  Lost earnings and lost earning capacity (until trial and in the future);

     e.  Necessary medical expenses (until trial and in the future);

     f.  Life care expenses (until trial and in the future);

     g.  Physical pain and suffering (until trial and in the future);

     h.  Physical impairment (until trial and in the future);

     i.  Exemplary/Punitive damages;

     j.  Attorneys' fees;

     k.  Costs of this action; and

     l.  Pre-judgment and all other interest recoverable.

## JURY TRIAL

93.    Jane Doe (K.R.D.) demands a jury trial on all issues.

**RELIEF SOUGHT**

94.     WHEREFORE, Jane Doe (K.R.D.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (K.R.D.) against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe (K.R.D.) may, in law or in equity, show herself to be justly entitled.

Dated: April 8, 2026

Respectfully submitted,

**THE LOCKS LAW FIRM**

/s/ Francesca A. Iacovangelo
Francesca A. Iacovangelo, Esq.
Eric D. Bihlear, Esq.
601 Walnut Street, Suite 720 E
Philadelphia, PA 19106
(215) 893-3454
(215) 893-3444 Facsimile
fiacovangelo@lockslaw.com
ebihlear@lockslaw.com

-and-

**SICO HOELSCHER HARRIS LLP**
David E. Harris, Esq. (PHV)
Ramsey S. Al-Azem, Esq. (PHV)
819 N. Upper Broadway
Corpus Christi, Texas 78401
(361) 653-3300
(361) 653-3333 Facsimile
dharris@shhlaw.com
ralazem@shhlaw.com

-and-

30

**ANNIE MCADAMS PC**
Annie McAdams, Esq. (PHV)
2900 North Loop West, Suite 1130
Houston, Texas 77092
(713) 785-6262
(866) 713-6141 Facsimile
annie@mcadamspc.com
service@mcadamspc.com

**ATTORNEYS FOR PLAINTIFF**

31